Good morning. May it please the Court, Dan Schecter on behalf of Emirates NBD Bank, appellant in the appeal that we referred to as InfoSpan 2. Excuse me, referring, relating to the arbitration issue. I'd like to reserve three minutes for rebuttal. Okay, but we have the two cases combined at this point. Yes, Your Honor, and I'm happy to proceed in any manner you wish if you'd like to hear from Mr. Isaacson first. How is your proposal to proceed? I just saw there were 10 minutes on the clock, so I understood the Court wanted us to handle the appeal separately. If you want them, join. I – are you arguing both cases? Yes, Your Honor. Take the whole 20 minutes and do whatever you want with them. Well, I think if we're going to combine them, Mr. Isaacson may want to go first. The other appeal is, I think, more consequential. All right. Okay. Go ahead by – I'm happy to proceed. He doesn't care. Okay. I wish we had gotten this together beforehand. So we're going to go 20 minutes, and he's going to proceed as he wishes. In that respect, I'd like to reserve three minutes for rebuttal then. Ten minutes? Three minutes, Your Honor. Three minutes. Okay. So I'll address myself then first to what we referred to as InfoSpan 1. That is the appeal by InfoSpan from the jury's verdict in favor of my client, Embritt's Bank. Okay. In that appeal, Your Honors, we are – the Court is faced with a verdict by a jury in complete rejection of the plaintiff's claims. And InfoSpan came to the district court and presented to the jury a theory that it had spent $100 million over some period of years between 5 and 8, depending on the testimony, to develop a proprietary system that involved cards and would allow international remittances, payments by low-income workers in the Gulf region. This Court should affirm the jury's verdict for multiple grounds. There was no abuse of discretion in relation to the five evidentiary rulings that are raised, but actually on an even more clear-cut basis, there was no error. Any error was harmless when the Court looks at the totality of the record and views it in the deference that it must give to a verdict which, although styled and captioned a special verdict, was clearly a general verdict. The Court asked the jury to simply find liability and then the amount of damages. There were no separate facts broken out. There were none. And we had asked for that. The Court declined. We objected to the verdict form. InfoSpan did not. And I think despite the name, the substance of the verdict is clearly a general verdict. So all facts were viewed in the light most favorable to my client and in support of the verdict. And we submit, Your Honor, before I move on, to the four snippets of testimony and one exhibit that are on appeal, challenge on appeal, and that's out of one exhibit out of 181 that were omitted and four pieces of testimony out of 1,700 pages of trial transcript. The error is harmless because InfoSpan could not sustain the most basic elements of the story that it presented to the jury. It claimed to have spent $100 million over a period of five to eight years to develop a working turnkey product that it brought to the bank. There should never be a case where a party would need to rely on circumstantial evidence to prove that fact. A party should have accounting records, receipts, invoices. There should have been at least one of these cards which InfoSpan claimed 300,000 were made. They could not present any of that. They couldn't. And also, one thing that I wondered about is they also, it was also integral to their case, as I understand it, that the servers were brought to Dubai and from there the code was stolen essentially. That was their assertion, Your Honor. And I gather you put on evidence that there was a dispute whether the servers were ever delivered in Dubai. Is that right? Correct, Your Honor. All right. And that's an example with a general verdict. We put on evidence, compelling evidence, that those servers didn't contain the code, that this Court should infer the jury rejected that assertion. And that they weren't actually delivered, as I understand it. Correct. It even went to that granular level. A second point, and it really goes to the point that you made, Your Honor. We put on testimony under subpoena from a gentleman who worked for InfoSpan for a year as the person in charge of the project. He's the only person ever employed as an employee or consultant by InfoSpan with banking. Hinosa? Sorry? Hinosa? No, this is Mr. Miller. Okay. Thanks. So Mike Miller is an L.A. resident, has worked at banks around town, was hired by, as a consultant by InfoSpan, spent approximately one year there. Third-party witness, no financial stake in the outcome. And he absolutely laid waste to InfoSpan's case. Despite the assertions by the plaintiff that they had a working system, he rejected that. He ultimately left InfoSpan because he did not believe InfoSpan was being truthful with the bank. And it's compelling to us that InfoSpan does not address Mr. Miller's testimony in its opening brief or on reply. And it was a centerpiece of our brief. All right. So let's go through the evidentiary rulings pretty quickly, because you also want to get to the personal jurisdiction question. That's right. Okay. So the first one, and I suspect the one that will draw the most discussion today, is the allegation against Mr. Hinosa characterized as rape. A few points to start with here. Number one, InfoSpan unmistakably placed its reputation at issue. Now, there could be cases in appeals where a lawyer would come before you and try to convince you why some manner of claim or damage theory put reputation at issue. We don't have to put any spin on the ball to make that argument. They put their reputation at issue explicitly. In the jury instructions they submitted in their version of the statement to the jury, they stated verbatim that the bank destroyed the reputation. That was submitted weeks in advance of trial. This is not a slip of the tongue by counsel or witness. This was a purposeful injection of the reputation at issue by trial counsel in writing before trial. Point one. Point two. Mr. Isaacson, in an opening statement, or closing statement I should say, explicitly said that the bank destroyed InfoSpan's reputation. Point three, Dr. Pakas, the economics expert that InfoSpan put on, testified because he had to, to survive Daubert, that their damage theory was predicated on a total destruction of the trade secrets and conceded that the reputational harm went into that theory. So there is no dispute that reputation was at issue. Second, their first witness, Dan Johnson, one of only two board members of the company and one of the only ones to testify, testified that whatever happened in Pakistan did impair the company's reputation. Mr. Bajwa, who also testified, he's the CEO, the controlling shareholder, the other board member, he testified that he had to spirit Dr. Hinojosa out of the country. So whatever happened, we didn't have a mini-trial on the issue, we didn't litigate the issue, we didn't put on any extrinsic evidence of the issue. All of this came from their witnesses. We have reputation explicitly put at issue and we have witnesses acknowledging that whatever happened in Pakistan injured the company's reputation. He's part of the dispute as to whether the evidence should have been submitted as if the word rape was used and the contention is there really wasn't a rape. Well, there certainly were disputes about that, but I would submit the following. Number one, we did not put any evidence. We asked their witnesses who had raised it at deposition, raised the word rape in a trial brief. Second, we were not attacking the character of anyone. We were not trying to, again, establish what happened. And then when my partner gave closure. Well, it certainly did attack the character of somebody. Yeah, but not character evidence in the sense of a witness. And really, Your Honor, when we look at the cases that deal with reputation, there's the Croce case, there's the forfeiture case that we cite, 890 Noyak Road. When a party puts reputation at issue voluntarily, as in the Croce case, or in the forfeiture case, where reputation is an independently relevant fact, that evidence can come in. And that's what the evidence was admitted. It was not to smear a witness. It was not to smear InfoSpan. The last point I'd like to make on this. Well, it was to smear InfoSpan. It was to smear its, well, it was to demonstrate that it had a bad reputation. Right. And we're going to get to this with the other, one of the other appellate issues was the Ensign litigation. That's the state court litigation that Mr. Isaacson and other counsel filed simultaneously with this against unrelated parties. Remember, they are asking for $554 million, potentially trebled, based on a total destruction of the trade secrets. So the fact that there, and reputational harm is a premise of that destruction. So any other basis for an impairment of the reputation, the incident with Dr. Hinojosa in Pakistan, the Ensign litigation where they challenged another company, another Pakistani company, totally unrelated to this case or the bank, for destroying the reputation. It's absolutely probative of that. Well, why exactly? That I little missed. I mean, they would have to demonstrate what part of their reputational injury was traceable to this case. But what is the point of the other case that they were making up this other place? Or was it that it was pertinent to how much the reputation was injured because it was also injured by this other thing? Or what? Both, Your Honor. Because of the second one, I mean, it doesn't prove anything that they allege the reputational injury. Well, it's an admission against interest. We're entitled to put on evidence that they took a position. There's actually a third piece, Your Honor. The Ascari Bank evidence in this case was a letter accusing Ascari Bank of reputational injury because they were delaying implementation of the same technology at issue in this case. So the fact that multiple other parties were accused by the same plaintiff of reputational injury and financial damage is absolutely probative. We're on 403, Your Honor. So the question is, is it probative? As I understand it, and I just want to make sure because it's of some interest to me, it seems to me at least as to the Ensign litigation, there's no question in the record that the district court conducted a Rule 403 balancing. But on the other instances, the accusation of rape, the bank, the eviction notices, there is no 403 balancing, correct? So I would be doing that de novo? There was no stated balancing, although I believe on one of the other three, Judge Selner referenced 403. But you're absolutely right, Your Honor. But he did in Ensign litigation. Yeah. In Ensign, they briefed it. And let's also be clear, this is a somewhat unusual case, not the first one, I'm sure. No motion to eliminate was filed on any of these issues. They had a free motion to eliminate, by the way. Judge Selner puts a limit. They didn't use all of them. No motion to eliminate. And other than the rape Hinojosa allegation where there was a sidebar request, no sidebar requested. And just to focus on the Hinojosa example, this came up with the first witness, second day of trial. The next day, they were most, other than 10 minutes of cross that I conducted of Mr. Scudder, they were cross-examining our witnesses. They could have gone to the court and asked for curative instruction. They could have asked for limiting instruction. The third day was a Friday. I put on Mr. Scudder. No objections when this topic comes up. We then have three days off, Saturday, Sunday, Monday. Court is dark on Monday. No motion filed. No curative instruction sought. No limiting instruction sought. So number one, they're not making it easy for the court, which has to rule in real time. And this panel has more collective trial experience as a judge than I have. So I know that Your Honors understand that. But the question then is, does there have to be a formal recitation on the record or we submit under Milner, Johnson, Beachy, does the record reflect that the court could apprehend the issues and was making a reasoned decision on the basis? So with respect to the Hinojosa allegation referred to as rape, they raised it in their trial brief. No surprise, by the way, all of these issues that they've raised came up in discovery. There was absolutely no surprise evidence here. So to suggest that they say in their trial brief on it, what was the gist of it? Were they saying that they were going to bring this out on their case or that it was of no moment in terms of rebutting the claim or claim of damages? Or were they in essence arguing for exclusion? They suggested in a very brief line that the issue should be excluded, that it was going to come up and that it was a one-liner, and I'll find it in a moment, and they asked the court to not permit it to come up. And then when it came up. It was only one line, correct? Yeah, I have it here. It's in, I can give the court the volume reference, but it's on page 5 of their trial brief. And they said at lines 13 through 15, for example, the bank asked Mr. Bajwa about a disagreement with a No Borders employee because Mr. Bajwa had been told that the No Borders employee had raped a woman in Pakistan, floating down a few lines. The bank asked Mr. Scudder about a disagreement with the No Borders employee about that employee's apparent unauthorized use. I'm sorry, this is an unrelated issue, not an appeal. They say the jury should not hear about any of these irrelevant and inflammatory matters. Do they cite any rule or any? No. No, they don't. There's no reference to Rule 403. To any rule. Not 403, any. So the matter is raised preliminarily. No motion in limine, but at that instance, it would be a hard rule to suggest that a trial court has to stop proceedings, make a formal recitation of Rule 403 where the parties clearly have brought it to their attention. And this is not a surprise. And with a free motion in limine available to ask this Court to disturb a general verdict based on this testimony, which after that happened, it came up again and again with other weaknesses. Well, if we thought there was a problem. Sorry? If we thought there was a problem. Yes. What would we, with the manner in which this was done, would we, I wondered about this. I couldn't quite figure out what happens if there, if the judge does not adequately do the 403 balancing, but if we were to do it de novo, we would conclude that it was properly excluded. Is that what we then do? Yes, Your Honor. It would have to be harmless. And I think that. Harmless is a different question. You mean harmless because objectively it was excluded. Right. If this Court found it was a proper balancing, but found that the Court failed to do it, the Court got the math problem right, but it didn't show its work. And I just think that on the other, there could be cases where you don't have to completely unscramble the eggs. But we had a two-week trial. We called dozens of witnesses. We floor witnesses from Dubai, which is probably a good segue to the jurisdictional point. If this Court concludes that the judge got it right, particularly where, at least on one of these issues, they raised it initially, and then as to all the other ones but Ensign, completely waived it. Rule 404 was never even raised below. And as to all these other ones, and I think our waiver arguments are laid out in the briefs. I'm running short on time, so I want to say this. Okay. It might go to jurisdiction. Yeah. Let me shift there. I will say an attempt at levity. I came to the Court today with the unshakable conviction that this would be the most complicated arbitration issue on calendar today. And you're wrong. And I was dead wrong. We need Judge Poston here for this case, too. Right. Well, I can simplify it in this manner. The InfoSpan 2 appeal, while more complicated legally, actually boils down to a simpler issue, which is where should the parties arbitrate? And in that respect, we would submit the issue is, is it proper for a district court which had concluded in an undisturbed ruling that it lacked personal jurisdiction over contract claims by this Cayman entity, InfoSpan Gulf, through whatever happened, we'll talk about it, is it proper for the court then to exercise jurisdiction to order an arbitration in this district? So first off, I don't think I need to belabor what this Court has said on waiver in the assertion of counterclaims. From Hillis v. Heinemann back. Can I just stop for a minute? If we agreed that there wasn't a waiver, there's still a substantive jurisdiction question. I mean, not a substantive, a personal jurisdiction question on the merits. Correct. And then what? Do we then decide it or do we then send that back to the district court? The court has its choice. We would submit that the court should decide it. Here's why. So in 2012, the court, the district court Judge Selna ruled on jurisdiction. He already decided it. He decided it. Because he decided it in the InfoSpan 1. Right. InfoSpan 1. And then he did reverse himself on a reconsideration motion as to the tort claims. Then we go forward. The bank seeks reconsideration of his order as to those still challenging jurisdiction. On contract, though, InfoSpan Gulf drops out. And this is where it can get very convoluted. But it drops out because it destroys diversity, because you lose alienage jurisdiction. So InfoSpan Gulf, the Cayman Entity, is out of the case for several years. We come into the case in 2014. And we say we want the bank to assert counterclaims. It's its right. It doesn't waive jurisdiction. Judge Selna initially said you're too late. That's not challenged. I think that's a ball and strike that a district judge has to call. They amend after we move for judgment. Well, I think we know all that. Okay. So the accusation, and maybe the court doesn't need to be convinced on waiver, the accusations of conduct giving rise to waiver. First, Peterson, it's a dicta statement by this Court. This Court didn't find waiver in Peterson. And everything the bank did was consistent with its position that it did not want to be in this Court, in the district court. And if it had to be, it wanted to arbitrate. And the reversal here, and what is confounding and disappointing about the Court's order, is that it was InfoSpan that changed positions. When we filed those counterclaims, it never occurred to us that they would seek to arbitrate because it had refused to arbitrate when the bank tried that in 2012. They said that the arbitration agreement was unenforceable. They convinced the trial court that you could split the analysis and that InfoSpan was not, the U.S. entity was not required to arbitrate the tort claims. But as the contract claims the Court had found and never changed its mind, those were arbitrable. So the only party that changed position was InfoSpan, who initially said, I don't have to arbitrate my contract claims. And then now, once we filed the counterclaims, said, we want to arbitrate your counterclaims, but we don't want to arbitrate our affirmative contract claims. Whatever this Court does, there will be, there can be an arbitration if InfoSpan wants to pursue it. Those claims have not been adjudicated. As you can imagine, we think the trial verdict says a lot about those claims. But the question is, what happens and where does the arbitration occur? And I think one other thing. And the issue is only where, not if. Correct. We don't, we want to arbitrate. We don't, my bank, my client has always wanted to arbitrate. The one thing I think the Court, the district court also missed is, this Court's decision in Bauhinia written by Judge Tang, the Court cited it for the premise that if there's no agreement of the site of arbitration, a court can only order arbitration in the district. But Judge Tang is also doing something in that decision that I think that Judge Selma should have done here. And I think this Court can do de novo or remand on this point. Judge Tang says if there was some implicit agreement, something that told us where the parties wanted to arbitrate, I could order it there. It can be an expressed agreement or an implied agreement. And we submit that there was substantial evidence in the record, in the form of the agreement, to indicate the parties should be able to arbitrate in Dubai. The agreement, as I understand it, says that it's under Dubai law and that it's in Dubai courts, but it doesn't say anything about where the arbitration is. Right. It does not explicitly say you have to arbitrate in Dubai, but it says. Other than the agreement that's relevant to this? No. The evidence of implied agreement is in there. And I think under Bauhinia, and if you look at the questions Judge Tang is asking in that opinion, or saying if these things happen, governing law UAE, Judge Selma found that in the jurisdictional case. The infotainment submitted to the jurisdiction of Dubai courts. And then it says arbitration under the laws of the UAE. Now, it doesn't take that last step, I agree, and say you've got to arbitrate in Dubai. But on that record under Bauhinia, it would be appropriate for a district court to say, I think these parties, who I've already found did not sufficiently engage in actions in this district to give rise to personal jurisdiction. But in fact, on your theory, I mean, you're getting a little aside because you claim that he has no jurisdiction to do anything. Oh, absolutely correct, yes. He has no jurisdiction. What's the theory? He has no jurisdiction to do anything and go away. Right. If I knew the court was going to sustain a lack of personal jurisdiction, these arguments are moot. All right, all right. I understand where you're going. I did wonder about that. It seemed like a strange rule. If a court can order jurisdiction in Dubai, I mean arbitration in Dubai, then I don't really understand why it matters exactly how clear the contract is rather than it's doing an ordinary contract interpretation. Right. But it does seem somewhat inconsistent with the rest of your theory. And then there's other more arcane issues of subject matter jurisdiction to the FAA. I think the one point I would leave the court with is there's circularity that we find disturbing in what the court did, particularly by letting the Cayman entity, which was allowed to drop out over the bank's objection because it was an indispensable party, who lacked jurisdiction, to come back into the case when they filed InfoSpan 2. And I think one thing that struck us, Your Honor, is that Your Honor's decision in Dow Chemical was actually, we think, misused by the trial court, where you noted that affirmative litigation conduct in these courts, bringing claims in U.S. courts, can give rise to specific jurisdiction. But defending actions should not. And that's really what happened here. Everything we did was defensive, and that there should be no limitation on what a party who is hailed into court, doesn't sit on its rights, does everything it can, short of an interlocutory appeal, which if the rule is that you have to take an interlocutory appeal to preserve your jurisdiction defenses, this Court's docket has just expanded quite a bit. Okay. Thank you very much. We'll give you a minute, Roberto. And, sir, you may start wherever you please. All right. I'll start with the appeal of the jury verdict and begin. It's Bill Isaacson, Your Honors. Good morning. And begin directly with the 403 issue and the issues that went to Infospan's reputation, as counsel has put it. And one of the problems here is that each of the allegations here go to the reputation of Infospan before the jury, but there's no linkage to a public reputation of Infospan. Well, I thought the linkage was that they asked somebody, they asked one of the Infospan witnesses whether this affected your reputation, I mean, this Hinosa thing, and they said, yeah. But there's no follow-up. There's no, like, reputation with who or what. So what? Well, we're talking about a balancing here. Right. So you're going to measure the level of what this is probative to to the amount of prejudice. The amount of prejudice I think is accepted is quite high when you're bringing up something like a sexual assault or a rape, and you're also accusing the company of these other things, fraud, and then bringing up these other litigations. Each of those are extremely prejudicial. And then in weighing the 403 issue, the issue is, are you getting to something that really has an effect on anything? You're urging that the absence of argument in closing dooms the admissibility of the evidence because the bank did not demonstrate the probative value. Is that the gist of your argument? Not so much closing, because they did raise this issue in closing, but just in terms of actual evidence. As to closing, it seems to me the way they argued it in the closing minimized any impact because they kind of didn't refer to the details at all. At that point, so part of this is the difference between being there and being here. Once this begins with the first witness and as this explosive allegation on the first day of trial, all that needs to be done in closing argument is to refer to it and refresh the jury's memory of what has happened. So it sounds like it did have great probative value on the reputation of InfoSpan. No, I disagree with that. What I'm referring to is the prejudicial effect. Because if this was going to have a strong probative value on the reputation of InfoSpan, there would have been some proof that other companies, other customers, other banks had some awareness of this, that other people who had dealings with InfoSpan had some information about this. None of that is part of this record. Well, wasn't it enough that this particular young woman was the daughter of a Pakistani military official and that the bank with whom the bank in this case was planning to do business with these cards was also owned or controlled by the Pakistani military? I don't think that linkage of the bank being owned by the Pakistani military or this individual having that sort of influence on these banks is at all in the record, Your Honor. Was it all what? I'm sorry? I don't believe that's in the record, Your Honor. Isn't the fact that the young lady was the daughter of a military, Pakistani military official in the record? That's that first part of it. All right. I mean, as I understood the point of it all was that this company is not going to be able to operate in Pakistan. I mean, it's not just some vague reputation, but it's that part of their plan was to have this supposed card used in Pakistan by this Pakistani bank and that they weren't going to be able to do that because they were never coming back to Pakistan. No? For one thing, that's not where any of the damages flowed from. So the markets in which damages have been estimated do not include Pakistan. Well, the damages don't flow from the fact that partly that they destroyed their ability to operate in Pakistan? No. No? They just do not. I thought it was that they were driving them out of business so they wouldn't be able to do what they would otherwise do, and one of the things they would have otherwise done was to operate in Pakistan. No, this case was not about business in Pakistan. Well, the Askari Bank was the bank that the migrant workers in the UAE were likely to be transmitting their funds to and therefore it was important to get the Pakistani bank on board if this was going to work, right? That part is relevant, yes, but there's no linkage. Right, so therefore they wouldn't be able to do it. That's what I meant by operating in Pakistan. They weren't going to be able to deal with this bank. But those are the workers transmitting money with the Pakistani bank. So what? The point is that this bank is not going to deal with them. I don't, that, that. We understand the cards are issued to the workers. They're not issued to the bank. Right. But the evidence of record, as I read it at least, was this was the bank where many of the Pakistani migrant workers would be expected to be transferring the funds, and therefore a smooth connection with that bank was critical to the operation. It was a program set up by Emirates Bank. I got it. Right. And so the inferences that you are raising I don't think are properly reflected in the record below, that this, that it's not even an argument I've ever heard before, so it's interesting, but that this military official would have some influence over in Pakistan such that this Emirates Bank card program set up with Infospan providing the technology that the Pakistani bank would not do business with. Well, all I can say is that both of us think we've gotten that, at least two of the three of us, and I don't know about the third, got that inference out of the way. The third, I guess, the third says, even if all these topics were irrelevant, and even if their probative value was substantially outweighed by the risk of their unfair prejudice, why would this exclusion have altered the jury's verdict? It seems to me, I mean, I'm just telling you, as I read this, first, you never developed a bank card capable of doing what was promised. Now, second, you made false representations at the bank that you had a functioning technology that had already been deployed for commercial use. Third, they investigated to determine whether you were a trustworthy business partner and specifically whether you owned technology that you promised to supply. And fourth, their decision to terminate the agreement was premised on its discovery of the many misrepresentations you had given them. That's the evidence, and I don't know why any of these four things had anything to do with that. So it's that recitation of the bank's evidence that is, to my mind, why this other evidence about prejudice was so important. Because in each of those cases... But the bottom line is, this evidence is something that was never, ever contradicted. Never. You are 100% wrong, Your Honor. I mean, I read the record. No, then, no, Your Honor. So the head of... There was user acceptance testing of all of this. There were thousands of transactions tested. The head of the project, Pishu Ganglani, right, set start dates for this project to go forward. It was only when people who did not know the technology stepped in and were concerned about revenue sharing that it was blocked. There were many, many exhibits about the testing that went on. There was testimony from both the InfoSpan witnesses about all the testing that went on, and it was actually ready to go. My understanding is they did have the one non-involved witness who was inside InfoSpan basically backed up the bank's story.  I thought he was in charge of the project. From a business point of view. And the testimony was that once the company became unhappy with him, that during the critical period he was home alone in his basement at home. The problem that I have with you is the same problem that I have on appeal with a lot of lawyers who are... I don't want them to give me a jury argument. I want me to tell them why there is no evidence, none, that I could rely on to suggest that you never developed the bank card capable of doing what happened. All of that is laid out in our opening brief in the Statement of Facts. All right, and, Your Honor, I understand the bank had testimony on the other side. And therefore, the jury can believe their testimony and not yours. The jury is entitled to do that in a system... I'm not arguing that this was a verdict without prejudicial evidence that this would be overturned. Let me ask you something. If you backed out the Hinosa rape, sexual assault, as to the possibility of prejudice on the record as a whole, the other three things couldn't possibly have turned the verdict, could they? The three together, I think, the other litigations, I think, are of substantial importance. I do think that. And that's why the law says we have to be very careful about letting in other litigations. But, Your Honor, the whole point of having a jury verdict where you're saying, whose evidence do they believe? Because we had witnesses, documents, internal documents from the bank saying this project was ready to go. Well, let me ask you, because maybe we're talking past one another here. Was there evidence that your client had a stored value card at the time it negotiated the agreement with the bank? Yes. And what was that evidence? That it had a workable card, marketed card, at that point in time? Nothing's been marketed at that point. Oh. But they said it was. Not marked, no. Yes, they said that it was being used all over the place, I thought. Well, when you say not marketed, you mean a prototype? Is that what you're referring to? That there had been testing of a card. Internally, at InfoSpan, correct? Is that what you mean? But you have to work with another bank, okay? It was working with a bank in the United States. And that was the testimony of the InfoSpan witnesses, including Mr. Scudder and Mr. Boschma. And that there was a card in testing. Yes. But you had never successfully produced and used in the marketplace an SVC card. Is that right? There was no evidence of that. Right, because we were moving forward with the bank. To do that. Wasn't there a public statement? We did it with another bank, but not with this bank. But wasn't there— Because you have to work with— So you would use it with another bank? Pardon? You would use—this card was used in another bank? Testing the bank, I believe it was in Oklahoma, yes. Testing, but not—it was not in the marketplace with actual live customers in use. Yeah, but that was not the representation that was being made. There was no notion that there's a InfoSpan card out there somewhere. I thought there was such a representation, a very specific one at one point. No, no, no. And, again, what you're getting into here are, yes, jury arguments. But we had a lot of evidence on our side on all of these things. So once the jury becomes distracted and inflamed by the prejudicial aspect, we don't get our side of the case fairly heard, including documents from the bank that said, we're ready to go with this project. It's working. It's been tested. User-accepted testing has been completed. So— It made no sense to say this card didn't exist. So InfoSpan did not represent that it was using this bank, which HSBC Bank was fully operational between the U.S. and Mexico and had more than 300,000 SBCs in circulation. It never said any of those things? Right. The explanation—right. So there were—I'd have to read you the full testimony, Mr. Bajwa. So there are explanations for all of that that were for the jury to decide. Well, were those statements made or was there testimony to support that those statements were made, that a jury could believe? I'm trusting that you're reading the statements from the record. Well, actually, what I was reading was from the opening brief because it was the easiest way to get at it. I don't know the exact statement. With citations. I don't know what. But I do remember reading it in the record. I just don't have it right now. That was a debate at trial about whether statements were made, there were misrepresentations, and the InfoSpan witnesses gave explanations for those at trial. And that was part of the trial. All right. Do you want to turn to the jurisdictional question in the other case? So, first of all, the issue of personal jurisdiction for this case was not decided in InfoSpan 1 because in InfoSpan 1 the issue was contacts with California. And here... All right. I don't understand that one for the following reason. You're arguing under Rule 4. Yes. What's the federal cause of action here? Oh, it's under the FAA. That's not a federal cause of action. Well, it's... It's not. It's just not. I know it's not a federal cause of action. But it's still the only, the relevant issue still is for... That doesn't matter. Rule 4 doesn't apply because it's not a federal action here. It's not a... There's no federal question. I mean, there's a federal question, but it doesn't arise under federal law. All right. Well, then the other aspect I would tell you is that this comes at a later point in time in which there's a substantial new additional record. And we've laid that out. Okay. But let's talk about the... All right. So that's jumping. Right. That's assuming the waiver decision was wrong. Right. And why isn't it wrong? So the waiver decision is correct because there were deliberate strategies employed in order to do two things. One was to re-argue the claims, that the tort claims should be arbitrated. And the other was to argue that the arbitration should take place in Dubai. But when you have a court saying there is no personal jurisdiction, or there is, one or the other, you have to go forward. The counsel can't just sit on their hands. In this particular instance, there's no question the court said they have personal jurisdiction. Go forward. The other side has to give every objection, fight on every particular issue that they can, after they've lost the big issue that they've got in front of them, which is exactly what you are suggesting they did. And I'm still trying to figure out why that's a waiver. So what you're talking about happens in, forgive me for saying, InfoSpan 1, when the personal jurisdiction ruling. And what happens then is that the bank says, all right, and once they have, in InfoSpan 2, we're going to bring counterclaims in order to try and, one, overturn the court's previous decision and get this arbitration in Dubai. So you're suggesting that if you get a ruling against you on personal jurisdiction, you cannot bring a counterclaim? But there wasn't that ruling. Is that what you're saying? No. Okay, tell me what you're saying. I'm saying that that's not what happened in InfoSpan 2. This was sequenced in order to seek relief from the court on these arbitration issues and then to raise the jurisdictional issue, which is exactly the posture before this court, is that once they were unsuccessful on those arbitration rulings. But I'm confused. They raised the personal jurisdiction in a separate motion. Then they raised it in the answer to the motion to dismiss, right? Then they got the arbitration ruling. And then other things happened in terms of what was in and out of the case. There's no doubt that if they weren't going to have personal jurisdiction, they wanted to arbitrate. That is what they wanted. And they had the right to try to do that in every way they could in the court. So what was the waiver? What did they do that was the waiver? You have to break down what you're saying between InfoSpan 1 and InfoSpan 2. So they got the adverse ruling on personal jurisdiction with respect to the tort claims in InfoSpan 1. They come back in InfoSpan 2. But they don't bring their motion to dismiss on personal jurisdictional grounds until after they've sought favorable arbitration rulings. So this is a different argument I never saw before, as far as I know. In other words, you're saying that the waiver wasn't in InfoSpan 1, it was in InfoSpan 2? Is this a Rule 12 waiver that you're urging? It's a Peterson waiver is how I think of it. Well, I mean, you're not suggesting that they didn't preserve it in an answer or by motion. It is, right. It was in the answer, but the sequencing of it is, and this is what Judge Selna is pointing to in his decision below. I thought he was basing it on what happened in InfoSpan 1. He does reference that, but the most important thing which he's culminating in is the conduct in InfoSpan 2, which you have to know what happened in InfoSpan 1, as this Court has learned. But ultimately, the bank sought relief from the Court, and then when they were unsuccessful, then raised the personal jurisdiction issues. And that's particularly offensive when they had said that they weren't going to be pursuing this other arbitration, and it's particularly offensive when they're saying, oh, it's clear cut, you've already ruled on this. I'm sorry, I'm looking at the district court's ruling in InfoSpan 2. Yeah. I don't see, he mentions not that they were trying to get a ruling on the arbitration, but that they went and instigated the arbitration in Dubai separately. But I didn't see anything in where he's relying, or can you show me where he's relying on anything that happened in InfoSpan 2? I'm referring to the top of, well, it's ER 30 at the top. All right. So he's referring to once they're unsuccessful before in InfoSpan 1, now they're trying to be successful in InfoSpan 2. But he doesn't say that at all. He says now that the bank has been unsuccessful in that endeavor in InfoSpan 1, it asks the Court to ignore the contract described above when deciding whether it has waived its personal jurisdictional defense in InfoSpan 2. Right, and that's what I'm referring to. But he doesn't say anything about something about InfoSpan 2 being a problem where? That's what I'm referring to is they don't raise the personal jurisdictional challenges in InfoSpan 2 until after they've litigated these other issues. He doesn't say that. Where does he say that? And it doesn't seem to be true. When deciding whether it's waived its personal jurisdictional defense in InfoSpan 2. But, I mean, it is a fact that they sought these rulings, that they re-litigated the arbitration issue before raising the motion to dismiss in InfoSpan 2. That's the chronology. But it was in their answer before they did any of those. Right. It's in the answer. It's in the answer. I'm not. I understand your argument. Thank you. Okay. Thank you very much. On the last point that was raised, I think it's completely incorrect. We moved to dismiss InfoSpan 2. We withdrew that motion when they wanted to amend. But I don't know. Honestly, I have no idea what counsel is talking about. And I couldn't address it other than to say the only reason we filed the motion in InfoSpan 2 after the conduct counsel referenced is because they filed it three years after they filed the original action. So I think that's all factually incorrect. And I think, Ruth Rizan, you were spot on. The record is clear. We always tried to resist jurisdiction. We always wanted arbitration. Now, the district judge did seem aggravated by the fact that you instituted arbitration in Dubai. He did. He did. And the reason we did that, Your Honor, was that after the time InfoSpan Gulf dropped out of the case to save jurisdiction, it went silent for almost three years to my recollection. And then they filed InfoSpan 2, ostensibly a deck relief action, on these counterclaims you wanted to file InfoSpan 1. And then InfoSpan Gulf resurfaces. And so, as you can imagine, we said to our client, now InfoSpan Gulf wants to arbitrate. If you think it should be in Dubai, one of your options is to commence an arbitration in Dubai. But it's all defensive conduct, and it chills litigation conduct of anything we did. Judge Posner's decision in Rice, where a party declined an invitation from the district judge to raise jurisdiction again, or the Yandel case, we didn't sit on our rights. On InfoSpan 1, just a few points. The opening brief, our opening brief, page 8, has a succinct recitation that, unfortunately, I have to say lays completely bare false accusations that you just heard. We absolutely put on evidence that they marketed this product as being proven. Well, I read that out of your opening brief. That's where I was reading from. Yeah, you're absolutely right. And counsel can say that that was disputed. The jury heard it, rejected it. But it is not true that they did not have evidence. Well, you would say they rejected it because they were biased by this other district. Well, but counsel just told you that that evidence didn't exist. And that's not true. And I have a problem with that. The connection between Ascari Bank and Emirates Bank on this project, Judge Castell, you've nailed it. It's in page 14 of our brief. It is absolutely vital. And you don't have to, again, we don't have to get real complicated here. You have record evidence that went in without objection that they accused Ascari Bank of reputational injury. We have three different instances where they accused other parties of injuring the reputation which they put at issue. And lastly, on that point of the link, Mr. Scudder, testimony, page 119, supplemental excerpt record, page 702, describes that link. There is compelling evidence to sustain this jury's verdict. And on the issue of jurisdiction, we did everything we could. We did it within the bounds of the law to defend our client. And we submit that the arbitration, if it goes forward, should happen in Dubai. Thank you very much. Thank both of you for your arguments in Folkspan v. Emirates Bank. Which is submitted. No. Yes. And also in Folkspan v. Emirates. Both in Folkspan cases. And we will go to Miller v. City of Santa Monica.
judges: Berzon, N.R. Smith, Castel